CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUL 19 2013

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| McAIRLAIDS, INC., | ) | Civil Action No. 7:12cv00578 |
| Plaintiff, | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| KIMBERLY-CLARK CORPORATION *et al.*, | ) | |
| | ) | By: Samuel G. Wilson |
| Defendants. | ) | United States District Judge |

McAirlaids, Inc. brings this action for trade-dress infringement and unfair competition pursuant to the Trademark Act of 1946, 15 U.S.C. § 1051 *et seq.* ("Lanham Act"), and Virginia common law against Kimberly-Clark Corporation and two of its affiliates. McAirlaids manufactures absorbent pads, the topmost surface of which is imprinted with offset rows of evenly spaced dots. McAirlaids claims that its rows of dots are inherently distinctive and that Kimberly-Clark's incontinence pads, which are also imprinted with rows of dots, infringe McAirlaids' registered trade dress. Kimberly-Clark has moved for summary judgment, arguing that McAirlaids' dot design is functional and therefore not protectable as trade dress. The court agrees with Kimberly-Clark, finds that McAirlaids' dot design is functional, grants Kimberly-Clark's motion for summary judgment, and cancels McAirlaids' trade-dress registration.

I.

The cornerstone of McAirlaids' business is a widely produced material known as "airlaid." Airlaid is used in all manner of consumer applications, from sanitary napkins to mattress pads. McAirlaids manufactures its version of airlaid from cellulose that it sources from softwood trees in the southeastern United States. McAirlaids thoroughly shreds the cellulose to

produce "fluff pulp," and then forms it into large, loosely formed, nonwoven sheets. Maksimov Dep. 142. While most airlaid manufacturers apply a chemical binder to give their airlaid materials structural integrity, McAirlaids uses a different process. Rather than applying a chemical binder, McAirlaids compresses the cellulose fibers by feeding them through a large pair of smooth-surfaced rollers. From there, the compressed sheets pass though a set of steel rollers that are covered in small, evenly spaced nibs. The "raised portions of the top roller press the fiber against raised portions of the bottom roller" to create "high pressure zones" in the airlaid. Resp. In Opp. 6; McAirlaids Ex. E-1, at 6. These high-pressure zones "force[] the cellulose fibers to lose their individual fiber structure and become strongly fused to one another forming a glassy-like continuum." McAirlaids Ex. E-1, at 6. The result—a sturdy, absorbent sheet—looks like this:



See U.S. Trademark Registration No. 4,104,123. Each dot indicates a bonded, nonabsorbent area in the material.

Because McAirlaids does not use chemical binders to give its airlaid structural integrity, the spacing of the bonds is important. According to Dr. Frank Murray, McAirlaids' expert, "[t]he bonds, . . . in order to capture [fibers] and make [binderless] bonding suitable, have to be spaced at about the average length of the fiber distribution of the wood fibers involved." Murray

2

Dep. 155. In other words, a significant portion of the fibers must be able bridge the gaps between adjacent bonds. See id. If the bonds are further apart than the longest fibers, then one end of each fiber will remain unbonded, offering little structural benefit. See id. at 155–56. By the same token, the size and shape of the bonds themselves are important. If an individual bond is too small, it "gets smaller than the cellulose fibers it's supposed to bond to." Id. at 157. As the size of the bond increases, the mechanical forces needed to create the bond increase (perhaps to the point of impracticability), while the unbonded area available for liquid absorption decreases. Id. at 217, 218. And if the bond is not rounded but instead has corners, the fusion process will damage and weaken the fibers. Id. at 231–34; see also id. at 233 ("[A]ny sharp angularity under the kinds of pressures that are being used for fusion bonds can damage the fibers.").[1]

McAirlaids has patented its bonding process. See U.S. Patent No. 6,675,702 (filed Jan. 13, 2004). In 2010, after deciding that fending off competitors though patent-infringement lawsuits was "slow, costly, and not always certain of success," McAirlaids applied for and received federal trade-dress registration for the arrangement of dots on its absorbent pads. See Kimberly-Clark Ex. A. Based on that registration, McAirlaids brought this lawsuit against Kimberly-Clark under the Lanham Act, claiming that Kimberly-Clark's Goodnites Bed Mats have an impermissibly similar arrangement of dots.[2]

## II.

The only issue before the court is whether McAirlaids' dot design is functional. If it is functional, then McAirlaids cannot rightly claim trade-dress protection for the design. The

---

[1] Notwithstanding this testimony, Dr. Murray concludes in his expert report that McAirlaids' dot design confers no functional benefit. See McAirlaids Ex. E-1, at 2.

[2] McAirlaids refers to the rows of dots as its "pixel design." See Maksimov Dep. 50.

parties are deeply at odds over the issue and have filed more than a thousand pages in support of their arguments. In the court's view, the answer is straightforward: because the dot design affects the quality of McAirlaids' product, it is functional, and therefore not fit for trade-dress registration.[3]

A product's design "may acquire a distinctiveness which serves to identify the product with its manufacturer or source." TrafFix Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23, 29 (2001). Designs with that sort of distinctiveness are protectable as trade dress and "may not be used in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods." Id. But because "product design almost invariably serves purposes other than source identification," Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 213 (2000), the "functionality doctrine developed as a common law rule prohibiting trade dress or trademark rights in the functional features of a product or its packaging," Rosetta Stone Ltd. v. Google, Inc., 676 F.3d 144, 161 (4th Cir. 2012).

> The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature. It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time, after which competitors are free to use the innovation. If a product's functional features could be used as trademarks, however, a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever (because trademarks may be renewed in perpetuity).

Id. (citing Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 164–65 (1995). The common

---

[3] Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties disagree as to whether McAirlaids has the burden of showing nonfunctionality or whether Kimberly-Clark has the burden of showing functionality. Persuasive authority counsels that the burden lies with McAirlaids. See Ga.-Pac. Consumer Prods. LP v. Kimberly-Clark Corp., 647 F.3d 723, 727 (7th Cir. 2011) (noting that if a party puts forth "strong evidence of functionality, the mark holder carries a 'heavy burden of showing that the feature is not functional'" (quoting TrafFix, 532 U.S. at 30)). But even assuming the defendant bears the burden, Kimberly-Clark has met it.

4

law functionality doctrine now has a place in the Lanham Act. Section 1052(e) of the Lanham Act prohibits trademark registration of any mark that "comprises any matter that, as a whole, is functional." According to the Supreme Court, "a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." TrafFix, 532 U.S. at 33.

In this case, there is ample evidence that McAirlaids' dot design increases the quality of its absorbent pads. In reaching this conclusion, the court could look to McAirlaids' own sales materials, which tout the functionality of its dot design. See Kimberly-Clark Ex. L, at KC0002675 ("The unique bonding pattern provides increased surface area for excellent [liquid] acquisition.").[4] The court might also rely on McAirlaids' own testing data, which shows that its dot design is stronger and more elastic than its previous fiber-fusion design. See McAirlaids Ex. E-1, at 12 Fig. 6 (showing a one percent increase in tensile strength and a forty-eight percent improvement in elongation).

Instead, the court will rely on McAirlaids' expert, Dr. Murray. According to Dr. Murray's testimony, the dot design is not arbitrary. If McAirlaids spreads the dots further apart, the resulting product is weaker. (It is easy to imagine that a pad with dots spaced a foot apart would offer little resistance to tearing.) If McAirlaids moves the dots closer together, the absorbency decreases. Absorbency likewise decreases if McAirlaids makes the individual dots larger, and the mechanical forces required for fiber fusion approach impracticability. And if McAirlaids uses a shape with sharp corners, the cellulose fibers lose their individual integrity. McAirlaids' dot design is, therefore, a careful balance between strength, absorbency, and manufacturing practicality. That balance affects the quality of McAirlaids' product. Cf. TrafFix,

---

[4] Cf. In re Bose Corp., 772 F.2d 866, 872 (Fed. Cir. 1985) ("In concluding that the Bose enclosure design is [functional], we need only believe Bose's own statements.").

5

532 U.S. at 33 ("[A] product feature is functional if it . . . affects the cost or quality of the article."). To permit trade-dress protection under these circumstances would be to allow McAirlaids perpetual control of a useful product feature. See Qualitex, 514 U.S. at 164 ("The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature.").

The court need not determine, as McAirlaids argues, whether other designs would perform equally well. When a design is functional under the traditional test for functionality (that test being the use-purpose-cost-quality test), there is "no need" to "speculat[e] about other design possibilities." TrafFix, 532 U.S. at 33. Such inquiries, if they are ever appropriate, arise in cases involving purely "esthetic functionality." See id. at 32–34; Qualitex, 514 U.S. at 170 (explaining that "if a design's 'aesthetic value' lies in its ability to 'confe[r] a significant benefit that cannot practically be duplicated by the use of alternative designs,' then the design is 'functional'" (alteration in original) (quoting Restatement (Third) of Unfair Competition § 17 (1993))). Accordingly, the court finds that McAirlaids' dot design is functional and grants Kimberly-Clark's motion for summary judgment.

### III.

Kimberly-Clark has filed a counterclaim for cancellation of McAirlaids' trade-dress registration. Under the Lanham Act, federal district courts have the power to "order the cancelation of registrations, in whole or in part, . . . and otherwise rectify the register with respect to the registrations of any party to the action." 15 U.S.C. § 1119. Pursuant to 15 U.S.C. § 1064(3), if a registration is functional, a court may cancel it at any time. Any such order "shall be certified by the court to the Commissioner, who shall make appropriate entry upon the records

of the Patent and Trademark Office." § 1119. Having found that McAirlaids' design is functional, the court will order cancellation of McAirlaids' registration.

## IV.

Though McAirlaids insists there is a genuine dispute for trial on the issue of functionality, the court sees no such dispute. McAirlaids' evidence of nonfunctionality consists, essentially, of its say-so. Given the stark evidence of functionality present in McAirlaids' own filings, and given that the law (indeed the Constitution) prohibits perpetual monopolies on useful designs, the court grants Kimberly-Clark's motion for summary judgment.[5]

**ENTER**: July 19, 2013.

_____
UNITED STATES DISTRICT JUDGE

---

[5] Because McAirlaids' dot design is functional, and not trade dress, its federal claims fail. And because federal patent law would preempt any state-law trade-dress protection for a functional design, McAirlaids' state-law claims also fail. See, e.g., Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 152 (1989) ("[S]tate regulation of intellectual property must yield to the extent that it clashes with the balance struck by Congress in our patent laws.").